Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

**19SL-CC02229**

IN THE CIRCUIT COURT FOR THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

| | |
|---|---|
| ASHFAQ HUSSAIN SYED, | ) |
| | ) |
| SHELLY RENEE BRANCH, | ) |
| | ) |
| A.M.S., by Next Friend Ashfaq Hussain Syed, | ) |
| (Pending appointment), | ) |
| | ) Case No.: |
| N.G.S., by Next Friend Ashfaq Hussain Syed, | ) |
| (Pending appointment), | ) Division: |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| FRONTIER AIR LINES, INC., | ) |
| | ) |
| Serve:   Sheriff of Cole County | ) |
| Prentice Hall Corporation | ) |
| 221 Bolivar St | ) |
| Jefferson City, MO  65101 | ) |
| | ) |
| Defendant. | ) |

## INTRODUCTION

1.  This is an action against Frontier Air Lines Inc. (hereinafter "Frontier").  The suit arises

    from an incident that occurred on July 15, 2018 when Plaintiffs were mistreated and

    harassed by a Frontier Check In and Gate Agent, baselessly removed from their flight,

    locked in a hot jetway, threatened by the same Gate Agent about the similar treatment

    that they would receive the following day for their rebooked flight. Plaintiff makes claims

    for negligent failure to transport, negligence per se, negligent manner of removal from

    the airplane, intentional tort, false imprisonment, and breach of contract.

## PARTIES

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

2.  Plaintiffs Ashfaq Hussain Syed and Shelly Renee Branch are single individuals who reside together at:

> 5 Country Club Dr.
> Fulton, MO, 65251
>
> Callaway County

3.  Plaintiff A.M.S. is an infant child, Date of Birth:  December 16, 2016, proceeding by Next Friend Ashfaq Hussain Syed (presuming appointment).

4.  Plaintiff N.G.S. is an infant child, Date of Birth:  December 16, 2016, A.M.S.'s twin, proceeding by Next Friend Ashfaq Hussain Syed, (presuming appointment).

5.  A.M.S. and N.G.S. are the natural children of Syed and Branch and reside with them.

6.  Before any proceedings occur in this case Syed will seek appointment as Next Friend of A.M.S. and N.G.S.

7.  Syed and Branch are a mixed-racial couple and Syed is of Middle Eastern complexion and descent.

8.  Syed is a Sergeant First Class in the Missouri Army National Guard.

9.  Syed has a Master's Degree in nuclear engineering and works as a supervisor in the Control Room of the Callaway Energy Center, a nuclear power plant in Callaway County, Missouri, which is owned and operated by Ameren Corporation, a large regional electric utility.

10.  Frontier Air Lines is a Nevada corporation with its principal place of business in Colorado.  Frontier has a place of business in St. Louis County, Missouri.  Frontier operates regularly scheduled commercial air service into St Louis County, Missouri multiple times a week, and in this County sells tickets for carriage.  Frontier has substantial revenues and expenses in St. Louis County.

11. Frontier reached into Missouri and sold Plaintiffs the tickets that form the genesis of this dispute.

## VENUE

12. The injuries suffered by the Plaintiffs arise directly out of the Defendant's conduct at the St. Louis Lambert International Airport which is in St. Louis County, Missouri.

## PERSONAL JURISDICTION

13. Personal Jurisdiction over Defendant is proper in Missouri under the Missouri long arm statute, RSMo. 506.500.

## JURY DEMAND

14. Plaintiff demands jury trial.

## GENERAL ALLEGATION OF AGENCY OF FRONTIER EMPLOYEES

15. Plaintiffs are informed and believe, and thereon allege on inference, that at all times herein mentioned, the complained of employees of Defendant Frontier were the agents, servants and employees of Defendant Frontier, and at all times herein mentioned, each was acting within the scope and course of said agency and employment.

## GENERAL ALLEGATION THAT PLAINTIFFS' COMPLIED WITH ALL LEGAL REQUIREMENTS

16. All Plaintiffs complied in all respects, whether or not material, with all legal and lawful conditions, requirements, ordinances, regulations and other legal and contractual undertakings incumbent upon them in connection with the Frontier Contract of Carriage, and with the rules and ordinances of the authorities at the airport of departure and proposed arrival, and all aircraft placards and crew member instructions.

Electronically Filed - St. Louis County - May 30, 2019 - 01:37 PM

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

## FACTUAL ALLEGATIONS

17.   On Thursday, July 12, 2018 Branch went on line to Defendant's website and purchased
confirmed tickets for the four Plaintiffs to fly one way from St Louis to Las Vegas, NV,
departing on Sunday, July 15, 2018 at 5:59 p.m., Frontier Flight No. F9 87, confirmation
no. YB517D.

18.   Syed and Branch were not certain of their return date and that was why Branch only
purchased tickets for one way.

19.   Branch selected seats 40D and 40E for herself and Syed.  Because the children were
under two at the time there was no charge for their travel and they were expected to sit on
Syed and Branch's laps.

20.   The total fee for all four one way tickets was $211.40, which included a $30.00 bag fee
for one bag and two $13.00 fees for seats reserved in advance of boarding.

21.   Branch paid for the trip with a Bank of America credit card.

22.   The purpose of the trip was for Syed and Branch to get married in Las Vegas, with their
children with them, and then to go as a family to see friends on the California coast.

23.   During the 24 hour period before the flight Branch and Syed checked in and received
boarding passes on their phones.

24.   When Plaintiffs arrived at the check in counter, they encountered a Frontier agent whose
hadge Plaintiff later read to read "Jerrasha Young," ("Young").

25.   Syed handed over his military ID card with his full name:  Ashfaq Hussain Syed.

26.   Young immediately became disagreeable and hostile.

27.   Branch asked Young to waive the hag fee because the Frontier website offers free
luggage for military personnel.

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

28. Young informed Plaintiffs that Syed and Branch would have to pay for the bag, despite the Frontier policy of providing free baggage carriage to military personnel.

29. Young then informed Plaintiffs that they could not sit together, despite the fact that Plaintiffs had confirmed seating together.

30. Plaintiff asked why and Young said that if Branch was going to argue and not accept that Branch and Syed could not sit together Plaintiffs would have to cancel their tickets.

31. At no time did Young explain her reason for refusing to allow the Plaintiffs to sit together or explain that there was an issue with available oxygen masks for five people seated in a three seat row (the four Plaintiffs plus whoever was in 40F).

32. Young's hostile behavior was especially hard to understand considering that Plaintiffs were traveling with two infant children flying for their first time, as Syed and Branch indicated at the outset of the interaction, and it would be readily apparent to Young or any objectively reasonable person that the family being able to sit together – even if across the aisle – would be a paramount priority for such passengers.

33. Young re-assigned Syed to a seat on left side of the plane, approximately 3-5 rows forward of row 40, in a window seat, stating that the new seat for Syed was the closest empty seat.

34. Young gave Syed and Branch new paper boarding passes.

35. Syed showed Young the children's birth certificates and Young gave Syed boarding passes for the children.

36. Young then informed Plaintiffs that as military they could both proceed through the TSA "pre-check" line.

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

37.  Plaintiffs went to the pre-check line and the TSA agent stated that although Syed's military ID would allow him in that line, Branch would not be allowed in that line because she lacked military ID or other paperwork to allow use of the pre-check line.

38.  Syed and Branch observed that the regular TSA line was not crowded so they proceeded to that line and went through security.

39.  After passing through security, Branch called Frontier customer service to inquire about the seating situation, because they had booked their seating in advance, arrived at the airport with confirmed seats together, and had been given no explanation for why they had been separated.

40.  The Frontier customer service agent Branch reached on the phone, identity unknown to Plaintiffs, ("the First Frontier Phone Agent") told Branch that she was restoring their previous seat assignments and told Branch to inform Young that she, the First Frontier Phone Agent, had done so.

41.  The First Frontier Phone Agent said that Frontier routinely booked families with small children who would ride in their parents' lap and there would be no problem.

42.  When Plaintiffs arrived at the gate, they observed that Young, the same person with whom they had interacted at the baggage check-in counter, was handling the gate.

43.  When Branch informed Young that the First Frontier Phone Agent had restored their seat assignments, Young started speaking to her in a loud and irritated voice.

44.  Young asked, "Who changed your seats?", and Branch told her it was the First Frontier Phone Agent.

45.  Young then stated: "You will listen to me. I am the one that will tell you where you can sit, and I told you that you will not sit together."

Electronically Filed - St. Louis County - May 30, 2019 - 01:37 PM

46.  Branch was made very uncomfortable by this loud and berating behavior as it was creating a scene in front of the other passengers.

47.  Branch asked for an explanation of why they could not sit together and Young still provided no explanation.

48.  Plaintiffs quietly took their seats in the gate waiting area as they wished to avoid further confrontation.

49.  Plaintiffs pre-boarded as a family at approximately 5:30 p.m.

50.  Plaintiffs walked down the aisle and approached their originally assigned seats in Row 40.

51.  At approximately that location a flight attendant confronted them and informed them that she had been made aware about them.

52.  The flight attendant then told Syed and Branch that they would not be able to sit together.

53.  Syed asked the flight attendant why they were receiving this treatment, and she informed Plaintiffs that there was an issue with the available oxygen masks with two lap infants.

54.  Syed and Branch then understood that there was a rational reason for separating them and they abandoned all thoughts and intentions to sit on the same side of the plane in the same row.

55.  Syed and Branch were then standing near their original seats, taking care of their children, and stowing their luggage.

56.  A female passenger sitting in 40F, the window seat on the right side of the plane in Plaintiff's original row, had overheard the conversation about the oxygen masks and she then offered to the flight attendant that she would sit in Syed's reassigned seat so that her

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

seat would be empty, and there would be enough oxygen masks for Plaintiff's family to sit together as four people in one row.

57.   The flight attendant stated to the woman in 40F "that will not work."

58.   The flight attendant left Plaintiffs' immediate area.

59.   Plaintiffs were still in the area of row 40.

60.   A passenger then walked toward where Plaintiffs were standing.

61.   It appeared to Plaintiffs that he was assigned to 39D.

62.   Syed asked that passenger if he would swap seats so that this passenger would take the seat approximately row 35 to which Syed was now assigned, so that Syed and one child could sit in closer proximity to Branch and the other child.

63.   The man good-naturedly agreed, sat down in Syed's assigned seat, and proceeded to put his head back in such a manner that he appeared to be falling asleep.

64.   At this point, all Plaintiffs were in aisle seats, in adjacent rows, one behind the other, with each adult holding a child in his or her lap, and consequently there was no potential issue with oxygen masks.

65.   The plane sat at the gate for what seemed an unusually long time.

66.   The plane was nearly full.

67.   While waiting for departure Syed and Branch did not witness any passengers make any complaint about them to any crew member.

68.   Plaintiffs had no interaction with crew during this interval.

69.   During this interval, Plaintiffs had brief interactions with other passengers who were charmed by the babies and Syed and Branch otherwise exchanged pleasantries with the other passengers, including the fact that it was the family's first flight together.

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

70. A passenger across the aisle asked if she could take a picture of the family on its first flight together and Syed and Branch agreed.

71. Branch gave the passenger her phone and the passenger took the picture at approximately 6:07 p.m.

72. Branch posted this picture to Facebook at 6:10 p.m.

73. Shortly thereafter, Young boarded the plane, marched up to the Plaintiffs, pointed her finger in Syed and Branch's faces, and said: "You and you get your stuff."

74. Syed and Branch, wordlessly complied by getting their carry on items and children together and followed Young down the aisle.

75. When they reached the front of the plane Branch asked Young where they were going and she said: "Off."

76. When Branch asked why, Young informed Syed and Branch that they would be told once they were off the plane.

77. As they exited the plane into the jetway area just off the airplane Young remained in the airplane doorway.

78. Branch saw another Frontier employee and asked that person to speak to a supervisor.

79. Branch recalls that the person stated that she was a supervisor and introduced herself as "Dez", (sp?).

80. "Dez" was on a walkie-talkie assisting with retrieving Plaintiff's stroller out of the plane's baggage hold.

81. "Dez" stated in response to an inquiry from Branch that Plaintiffs were being removed from the plane because the "passengers and flight attendants felt uncomfortable with Plaintiffs being on the plane.

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

82.  Dez then left the area via the jetway.

83.  Branch again asked why they were being removed from the flight and Young stated that
     it was because they had made "the flight attendants and passengers uncomfortable."

84.  At this point, Plaintiffs observed Young, the flight attendant and another unidentified
     employee snickering at them from the open plane door.

85.  Plaintiffs pressed the Frontier employees for further explanation but received none.

86.  Young then pushed past the Plaintiffs, proceeded up the jet way with Plaintiff following
     well behind, and closed the jet way's terminal door, leaving Plaintiffs in the jet way.

87.  Branch pushed on the terminal jetway door but it would not open.

88.  Branch went back to the airplane end of the jet way and found that the airplane door was
     closed.

89.  At that point Plaintiffs were locked in the jet way tunnel, with a locked door to the
     terminal on one side and a locked plane door on the other side.

90.  Plaintiff s remained locked in this tunnel, and were unable to exit.  It was hot, they were
     sweating, and the babies were screaming.  They sat down because of the heat.

91.  Frontier controlled the exits of the jet way.

92.  Syed and Branch understood that it would be unlawful to go out the jetway door leading
     to the tarmac and did not attempt that method of leaving the jetway.

93.  While still in the jetway Branch called Frontier customer service by her cell phone and a
     Frontier customer phone service agent, (the "the Second Frontier Phone Agent"),
     answered.

94.  Branch explained the family's circumstances and the Second Frontier Phone Agent said
     that her records showed that they were on the plane.

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

95. Branch explained that the family was in the jetway.

96. The Second Frontier Phone Agent stated that she would get someone to let them out.

97. Branch was diagnosed years ago for migraine headaches. Her migraines are sometimes caused by stress.

98. Branch began developing a headache, likely a migraine, from the stress.

99. A Frontier Employee opened the terminal door to the jetway and standing next to that person was Young.

100. The amount of time Plaintiffs and their children were locked in the jetway tunnel is unknown but Plaintiffs estimate a few minutes, approximately 3-10 minutes, and it felt like a very long time.

101. Branch then initiated another cell phone call to customer service.

102. Branch spoke to a third telephone customer service agent to request that the family's flight be re-booked.

103. In the alternative Plaintiff was on hold from the original call and the conversation was a continuation of the call with the Second Frontier Phone Agent – Plaintiff has no clear memory of which it was. (Plaintiff will hereafter refer to this conversation as being with the "Third Frontier Phone Agent").

104. The Third Frontier Phone Agent informed Plaintiffs that an agent on the scene needed to make a computer entry showing them as removed from the flight so that rebooking could take place.

105. The only agent on the scene was Young, so Branch asked the Third Frontier Phone Agent if she, Branch, could put her phone on speaker and the Third Frontier Phone Agent agreed.

11

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

106. A speaker phone conversation ensued between the Third Frontier Phone Agent, Syed, Branch and Young.

107. Young initially refused to comply with the Third Frontier Phone Agent's request to change Plaintiff's status from on the flight to off the flight, but eventually, grudgingly, did so, after Third Frontier Phone Agent confronted her and told her it was the least she could do.

108. The Third Frontier Phone Agent re-booked Plaintiffs for the next day and the phone call ended.

109. As Plaintiffs were walking away, Young was standing with two other individuals, including "Dez", looking at Plaintiff, and Young started making comments to the Plaintiffs. Branch was taking a video at this point. Young said: "Ma`am I didn't even give you permission to record me and that's illegal. See you tomorrow."

110. Plaintiffs ignored this comment and kept walking, at which point Young followed them, walked in front, turned around and stopped them, and said: "I don't think you heard me. I will see you at the gate tomorrow. It's the exact same crew as today." She then smiled widely and walked away.

111. Soon thereafter Syed called customer service and confirmed that it was indeed the exact same crew the next day, at which point he cancelled their flight.

112. Syed later went on-line to the feedback page filed a written complaint with Frontier stating the above story in abbreviated form.

113. It is not illegal to take videos of flight attendants and/or otherwise take videos on airplanes, 49 U.S.C. 46504.

12

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

114.  In any case Syed and Branch neither took video on the airplane nor harassed flight attendants.

115.  It is not illegal for customers to trade seats.

116.  Syed's on-line complaint contains an error in that it suggests that Plaintiffs learned of the issue of too many people in the row for the oxygen masks earlier than they actually received that information.

117.  Syed called Frontier approximately the next day, spoke to "Lisa", told the story, and asked for the family's money back.

118.  Frontier opened investigation No. 180821-001664.

119.  Approximately two days later a Frontier representative named "Beth" called Plaintiff Syed's phone and spoke to Syed and Branch by speaker phone.

120.  Beth stated that they had investigated the complaint and found that Syed was taking videos after being told by flight attendants to stop, harassing flight attendants, and asking customers to trade seats.

121.  On August 21, 2019 "Beth" sent an e-mail to Syed stating that he would receive a refund on the credit card ending in 0676.

122.  Plaintiffs have never received a refund on that card or any other card or by any other method.

123.  Approximately two months later Branch wrote a Facebook post describing their experience, which generated considerable social media outrage.

124.  A number of individuals, including Donna Stern, Branch's mother, contacted Frontier and/or posted on Facebook to complain about Frontier's behavior.

125.  Frontier replied by e-mail to some of those who complained by defending its position.

13

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

126.   "Beth", Frontier's investigator, wrote to Branch's mother, Donna Stern, on September 13, 2018 at 4:49 p.m. and stated:

    a.   The children "were not included on their reservation".

    b.   "The parent who had been reassigned was now back in their (sic) original seat",

    c.   The "parents were not complying with crew member instructions and insisted on flying in a way that could jeopardize safety of flight".

    d.   "They were provided with a refund".

### NO COMPARATIVE FAULT

127.   Plaintiffs were not at fault in any way.

### NO LEGAL JUSTIFICATION

128.   There was no legal justification for Frontier to throw Plaintiffs off the flight or imprison Plaintiffs in the jetway.

### DAMAGES

129.   Plaintiffs did not receive the benefit of their contract with Frontier because Frontier did not provide transportation to Plaintiff's family from St. Louis to Las Vegas on July 15, 2018.

130.   Due to the cancellation of their tickets, among other reasons, Syed and Branch have not yet married.

131.   All Plaintiffs lost the benefits associated with their expected trip to Las Vegas and the west coast.

132.   Syed and Branch suffered garden variety emotional damages from the loss of the transportation to Las Vegas.

133.   During the time Plaintiffs' were imprisoned in the jetway all four Plaintiffs suffered fear,

Electronically Filed - St. Louis County - May 30, 2019 - 01:37 PM

loss of liberty, uncomfortable conditions, humiliation, indignity, disgrace, stress, embarrassment and, mental suffering.

### PUNITIVE DAMAGES – NEGLIGENCE, NEGLIGENCE PER SE

134.    Defendant's conduct in throwing Plaintiffs off the flight, through the actions of Young and other representatives of Frontier, all acting with actual or apparent authority, showed complete indifference to or conscious disregard for harm to others.

### PUNITIVE DAMAGES - INTENTIONAL TORT AND FALSE IMPRISONMENT

135.    Defendant's conduct in throwing Plaintiffs off the flight and imprisoning Plaintiffs in the jetway, through the actions of Young and other representatives of Frontier all acting with actual or apparent authority, was outrageous because of the Defendant authorized representatives' evil motives and/or reckless indifference to the rights of Plaintiffs.

136.    Frontier's conduct, through the actions of its authorized agents, from the moment Plaintiffs arrived at the check-in counter until they left the airport, showed complete indifference to and/or conscious disregard for the safety and rights of Plaintiffs.

### UNFAIR OR DECEPTIVE PRACTICE
### TO BUMP PAYING PASSENGERS FOR NO REASON

137.    The "Transparency Improvements and Compensation to Keep Every Ticketholder Safe Act of 2017" or the "TICKETS Act", Public Law No: 115-254, Title IV, Subtitle A, Sec. 425, HR 302, passed by both houses and signed by the president, effective October 5, 2018, ("the statute"), (which is a date after this incident}, states in relevant part:

> It shall be an unfair or deceptive practice under subsection (a) for an air carrier or foreign air carrier subject to part 250 of title 14, Code of Federal Regulations, to involuntarily deplane a revenue passenger onboard an aircraft, if the revenue passenger—

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

        (A)    is traveling on a confirmed reservation; and

        (B)    checked-in for the relevant flight prior to the check-in deadline.

138.    When Defendant expelled Plaintiffs from the airplane, Defendant violated this Act,

(although the act was not yet effective).

### COUNT I – NEGLIGENCE
### Failure to Transport Plaintiffs
### All Plaintiffs Against Defendant

139.    Plaintiffs incorporate all prior paragraphs.

140.    Plaintiffs had confirmed paid for tickets to Las Vegas on Frontier flight F9 87 for July 15,

2018 from St. Louis to Las Vegas.

141.    Plaintiffs and Defendant had the relationship of passenger and common carrier.

142.    Defendant had a duty to exercise the highest degree of care to safely transport Plaintiffs

to Las Vegas.[1]

143.    Plaintiff boarded the plane for the flight.

144.    Defendant, through its authorized representatives, removed Plaintiffs from the plane.

145.    Defendant, through its authorized representatives, made it impossible for Plaintiffs to go

to Las Vegas the next day.

146.    Plaintiffs did not go to Las Vegas at all.

147.    When Defendant, through its authorized representatives, removed Plaintiffs from the

plane and prevented them from going the next day, Defendant breached its duty to

transport Plaintiffs to Las Vegas.

---

[1] *Spencer v. Am. Airlines, Inc.*, 553 S.W.3d 861, 867 (Mo. Ct. App. 2018), *Dykens v. E. Airlines, Inc.*, 865 F.2d 1271 (9th Cir. 1989), *Goliger Trading Co. of N. Y. v. Chicago & N. W. Ry. Co.*, 184 F.2d 876, 880 (7th Cir. 1950), *Baltimore & O.R. Co. v. Thornton*, 188 F. 868, 877–78 (4th Cir. 1911), *Siegel v. Illinois Cent. R. Co.*, 186 Mo. App. 645, 172 S.W. 420, 422 (1915).

148. Defendant, through its authorized representatives failed to use to use that degree of care that a very careful person would have used under the same or similar circumstances to provide Plaintiffs transportation to Las Vegas.

149. It was reasonably foreseeable to Defendant that Plaintiffs would suffer damages if Defendant, through its authorized representatives, removed Plaintiffs from the plane and made it impossible for them to go to Las Vegas the next day.

150. Plaintiffs suffered the special and general damages associated with the loss of the transportation.

151. Plaintiffs suffered garden variety emotional distress.

152. Defendant's conduct, through its authorized representatives, showed complete indifference to or conscious disregard for harm to others.[2]

153. Defendant's conduct, through its authorized representatives, demonstrated conscious negligence tantamount to intentional wrongdoing because Defendant's authorized agents were conscious of their conduct, and, though having no specific intent to injure, must have been conscious, from their knowledge of surrounding circumstances and existing conditions, that their conduct would naturally or probably result in injury[3] and/or that there was a high probability that their conduct would result in injury.[4]

---

[2]*Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prods., Inc.*, 700 S.W.2d 426, 435 (Mo. banc 1985), MAI 10.02.
[3]*Tubbs v. BNSF Ry. Co., Inc.*, 562 S.W.3d 323, 340–41 (Mo. Ct. App. 2018)
[4]*Poage v. Crane Co.*, 523 S.W.3d 496, 515 (Mo. App. E.D. 2017) (quoting *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 164 (Mo. App. W.D. 1997) (en banc)), *Oyler v. Hy-Vee, Inc.*, 539 S.W.3d 742, 746 (Mo. Ct. App. 2017)

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

WHEREFORE, on Count I Plaintiffs pray for judgment against Defendant under the theory of negligence for compensatory damages in excess of $25,000.00, punitive damages, costs, and for such other relief as the court finds to be just, meet and reasonable.

### COUNT II – NEGLIGENCE PER SE
### Violation of TICKETS Act
### All Plaintiffs Against Defendant

154.  Plaintiffs incorporate all prior paragraphs.

155.  Plaintiffs checked in prior to the check-in deadline

156.  Plaintiffs entered and went to their seats on the airplane as paid passengers with confirmed reservations.

157.  Defendant forced Plaintiffs to involuntarily deplane.

158.  The TICKETS Act, albeit enacted into law after this incident, defines the duty of the common carrier to transport paying passengers.[5]

159.  Pursuant to the statute under these circumstances it was an unfair or deceptive practice to involuntarily deplane Plaintiffs.

160.  Defendant, through its authorized representatives, violated the statute.

161.  Plaintiffs are members of the class of persons intended to be protected by the statute.

162.  The damages outlined above are the kind of damages the statute was designed to prevent.

163.  The violation of the statute was the cause of Plaintiff's damages.[6]

164.  Defendant's conduct, through its authorized representatives, showed complete indifference to and/or conscious disregard for harm to others.[7]

---

[5] Plaintiffs are unaware of any precedent stating that a later enacted statute may not relate back in a negligence per se claim.

[6] *Martinez v. Kilroy Was Here LLC*, 551 S.W.3d 491, 496 (Mo. Ct. App. 2018)

[7] *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prods., Inc.*, 700 S.W.2d 426, 435 (Mo. banc 1985), MAI 10.02.

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

165. Defendant's conduct, through its authorized representatives, demonstrated conscious negligence tantamount to intentional wrongdoing because Defendant's authorized agents were conscious of their conduct, and, though, in the alternative, having no specific intent to injure, must have been conscious, from their knowledge of surrounding circumstances and existing conditions, that their conduct would naturally or probably result in injury[8] and/or that there was a high probability that their conduct would result in injury.[9]

WHEREFORE, on Count II Plaintiffs pray for judgment against Defendant under the theory of negligence per se for compensatory damages in excess of $25,000.00, punitive damages, costs, and for such other relief as the court finds to be just, meet and reasonable.

### COUNT III -- NEGLIGENCE
### Manner of Removal from Plane
### All Plaintiffs Against Defendant

166. Plaintiffs incorporate all prior paragraphs.

167. Defendant and its agents had a duty as a common carrier to exercise ordinary care under the circumstances for the well-being and treatment of its passengers.

168. It was reasonably foreseeable that Defendant and its agents' improper treatment of the Plaintiffs in the manner in which they were removed from the plane would result in aggravation, inconvenience, distress, and would deprive them of their family trip.

169. Defendant and its agents breached the duty of a common carrier to Plaintiffs by the cruel and callous manner by which they ejected Plaintiffs from the aircraft, including by drawing attention to Plaintiffs as though they were criminals in front of all the passengers

---

[8]*Tubbs v. BNSF Ry. Co., Inc.*, 562 S.W.3d 323, 340–41 (Mo. Ct. App. 2018)
[9]*Poage v. Crane Co.*, 523 S.W.3d 496, 515 (Mo. App. E.D. 2017) (quoting *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 164 (Mo. App. W.D. 1997) (en banc)), *Oyler v. Hy-Vee, Inc.*, 539 S.W.3d 742, 746 (Mo. Ct. App. 2017)

Electronically Filed - St. Louis County - May 30, 2019 - 01:37 PM

Electronically Filed - St Louis County - May 30, 2019 - 01:37 PM

heading to Las Vegas, by terrifying Plaintiffs, leaving them in a locked jetway, and

intimidating them into cancelling their rescheduled flight.

170.   As a result, all Plaintiffs suffered monetary damages, inconvenience, embarrassment, and

emotional distress from this outrageous conduct, which continue to affect all Plaintiffs.

WHEREFORE, on Count III Plaintiffs pray for judgment against Defendant under the

theory of negligent manner of removal from the airplane for compensatory damages in excess of

$25,000.00, punitive damages, costs, and for such other relief as the court finds to be just, meet

and reasonable.

## COUNT IV – INTENTIONAL TORT
### Intentional Removal from Plane
### All Plaintiffs Against Defendant

171.   Plaintiffs incorporate all prior paragraphs.

172.   Defendant, through its authorized representatives, intentionally removed Plaintiffs from

the plane.

173.   At the time there was no statute, law or regulation specifically making unlawful the

removal of Plaintiffs from the plane.

174.   The removal of Plaintiffs from the plane caused Plaintiffs damages as outlined above.

175.   There was no justification and/or there was insufficient justification for Defendant's

removal of Plaintiffs from the plane.[10]

176.   Defendant's conduct, through its authorized representatives, was outrageous because of

Defendant's evil motive or reckless indifference to the safety and rights of others.[11]

---

[10]*Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo. App. 1980), *Billingsley v. Farmers All. Mut. Ins. Co.*, 555 S.W.3d 1, 6–7 (Mo. Ct. App. 2018).
[11] MAI 10.01

Electronically Filed - St. Louis County - May 30, 2019 - 01:37 PM

WHEREFORE, on Count IV Plaintiffs pray for judgment against Defendant under the theory of intentional tort for compensatory damages in excess of $25,000.00, punitive damages, costs, and for such other relief as the court finds to be just, meet and reasonable.

### COUNT V – INTENTIONAL TORT
### False Imprisonment in the Jetway
### All Plaintiffs Against Defendant

177. Plaintiff incorporates all prior paragraphs.

178. By confining Plaintiffs into the overheated jet way with no exit, Young knowingly and unlawfully constrained Plaintiffs and completely restricted their movement without their consent.

179. The Plaintiffs were aware that they had been locked in the jetway and were not free to leave, which was a substantial interference with their liberty.

180. The actions of Defendant's agents were reasonably foreseeable in that the actions of defendant's agents were within the scope of their employment.

181. As a result Plaintiffs suffered damages including humiliation, heat duress, mental anguish, and fear for their wellbeing and that of their children.

182. Defendant's conduct, through its authorized representatives, was outrageous because of Defendant's evil motive or reckless indifference to the rights of others. [12]

WHEREFORE, on Count V Plaintiffs pray for judgment against Defendant under the theory of false imprisonment for compensatory damages in excess of $25,000.00, punitive damages, costs, and for such other relief as the court finds to be just, meet and reasonable.

### COUNT VI - BREACH OF CONTRACT
### Breach of Contractual Duty to Transport Plaintiffs to Las Vegas

---

[12] MAI 10.01

Electronically Filed - St. Louis County - May 30, 2019 - 01:37 PM

**Syed and Branch Against Defendant**

183. Plaintiff incorporates all prior paragraphs.

184. Plaintiffs and Defendant Frontier entered into a contract of carriage to transport Plaintiffs from St Louis, MO to Las Vegas, NV.

185. As consideration for this contract, Plaintiffs paid $211.40.

186. Plaintiffs complied in every way with the conditions of the contract.

187. Under the terms of the contract, Frontier may refuse carriage for a limited set of reasons, none of which were applicable when they refused to carry Plaintiffs.

188. By refusing to carry Plaintiffs after they had purchased valid tickets and engaged in a binding contract, Defendant Frontier breached the contract by its refusal to perform.

189. As a result, Plaintiffs suffered actual, consequential and benefit of the bargain damages[13] as a direct result of Defendant's breach, in an amount to be determined at trial.

WHEREFORE, on Count VI Plaintiff prays for compensatory damages in a fair and reasonable amount, court costs, and for such other relief as the court finds to be just, meet and reasonable.

Respectfully Submitted,

  /s/ W. Bevis Schock   .
W. Bevis Schock, 32551MO
Attorney for Plaintiffs
7777 Bonhomme Ave., Ste. 1300
St. Louis, MO  63105
wbschock@schocklaw.com
Fax:   314-721-1698
Voice: 314-726-2322

---

[13] *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.2d 522, 531 (Mo Banc. 1983), *Curators of the University of Missouri v. Suppes*, WD81278, January 8, 2019, 2019 WL 121983.